## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GILBERT V. HUERAMO II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17 C 4486 |
| | ) | |
| ROY WELLS, Chief of Police of the Village | ) | |
| of Robbins, and THE VILLAGE OF | ) | |
| ROBBINS, a municipal corporation in the | ) | |
| State of Illinois, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Gilbert Hueramo II filed this reverse race discrimination lawsuit against the Village of Robbins and its former Chief of Police, Roy Wells, alleging he was unlawfully terminated from his part-time patrol officer position because of his race. He brings claims under the Equal Protection Clause and Title VII. Before the Court is Defendants' motion for summary judgment. For the reasons that follow, Defendants' motion is granted.

## BACKGROUND

### I. The Local Rules

Before delving into the facts, the Court begins, as it too often must, with a few necessary words about compliance with the Local Rules. Local Rule 56.1 creates the

ground rules for summary judgment and imposes clear requirements for how parties must present the facts. The moving party must file a statement of material facts, in concise numbered paragraphs. *See* L.R. 56.1(d)(1). The movant must support each fact with a citation to the evidentiary record. *See* L.R. 56.1(d)(2).

The non-movant then has a duty to respond to each numbered paragraph. *See* L.R. 56.1(e). The non-movant must "admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." *See* L.R. 56.1(e)(2). "It is not good enough for the non-movant to say 'disputed,' and leave it at that." *Zambrano v. City of Joliet*, 2024 WL 532175, at *1–2 (N.D. Ill. 2024) (Seeger, J.). Instead, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must *concisely explain how the cited material controverts the asserted fact*." *See* L.R. 56.1(e)(3) (emphasis added).

Here, on numerous occasions, Hueramo responded to paragraphs in Defendants' statement of material facts by declaring that a fact was "disputed," and then citing several pages of deposition testimony or other exhibits—without any accompanying explanation. As an example:

> 13. Citizen complaints were filed against Hueramo while he was employed with Phoenix, Summit, Island Lake, and Robbins Police Departments. (Ex. A, pp. 35-37; Dkt. #32, ¶17).
>
> **ANSWER:** Disputed. (Ex. A, pp. 116-119, Ex. B, pp. 176-185, Wells Dep. Ex. 34[]).

Dkt. # 79, ¶ 13 (bold in original); *see also id.* at ¶¶ 9, 16, 26, 35, 38, 42, 43, 72, 79.

2

There is no explanation to be found. Judge Seeger recently addressed and rejected this practice in *Zambrano*, and his words there apply in equal force here:

> Based on the filing, this Court has no idea why [Hueramo] is disputing the fact in question. This Court couldn't figure it out without pulling out the deposition transcript, reading the testimony for itself, and then spending the time to figure out why the paragraph is inconsistent with the testimony.
>
> In effect, [Hueramo] is attempting to reassign work that the Local Rules place on the parties, and putting the work on the Court's plate. But the Local Rules place the burden on the parties, for good reason. The parties know the record better than the Court. They're better positioned to know what the issues are, and what evidence is important. And at the end of the day, the parties are the ones who have their interests at stake.
>
> Summary judgment is not a game of fetch, where the district court judge is required to chase after the evidence thrown somewhere in the record by the parties. It is not the job of a district judge to comb through the record and search for evidence that can support an unsupported assertion by a party. Providing an explanation is the job of the parties. If the parties don't give an explanation, then a lower court does not have to go on an expedition to hunt for one.

*Zambrano*, 2024 WL 532175, at *2.

As the Seventh Circuit has "recognized time and again," district courts may require strict compliance with the local rules. *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020). Therefore, the Court will consider Hueramo's response to the statement of material facts to the extent that it complies with the Local Rules. However, any response that fails to "concisely explain how the cited material controverts the asserted fact" will be disregarded. *See* L.R. 56.1(e)(3). Any denial without an accompanying explanation is stricken, and the corresponding fact is deemed admitted (to the extent that it is properly supported). *Zambrano*, 2024 WL 532175, at

*2; *see also Romano v. Roundy's Ill., LLC*, 2022 WL 4356926, at *2 (N.D. Ill. 2022) (facts deemed admitted where a party merely asserts a fact is "disputed" but cites no record evidence nor provides any explanation why the fact is disputed).

## II. Factual Background

In resolving Defendants' motion for summary judgment, the Court views the evidence in the light most favorable to Hueramo as the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are undisputed except where noted. Any asserted facts or factual disputes that were not supported by evidence or were immaterial or otherwise inadmissible have not been included.

Hueramo, who is Caucasian, was formerly employed by Defendant the Village of Robbins ("Village" or "Robbins") as a probationary police officer. Defendant Chief Roy Wells, an African American, was the Village Police Chief from February 2016 to May 2021.

Hueramo was hired by Chief Wells on June 16, 2016. When Chief Wells hired Hueramo, he was aware that there had been citizen complaints filed against Hueramo when he was employed at three other police departments, although the nature of those complaints is not clear from the record. As a probationary officer with the Robbins Police Department, Hueramo was considered an at-will employee of the Village. During his period of employment, he was one of two white officers in the department.

Just one month into his employment with the Robbins Police Department, Hueramo was named Officer of the Month for his work solving an armed robbery. Within a few months, Chief Wells offered Hueramo a promotion to be a sergeant. Chief Wells had confidence in Hueramo and thought he had knowledge of Illinois law and statutes. Chief Wells also thought Hueramo was good with the citizens in the community and got along well with his coworkers. Hueramo turned down the promotion and says that was because of family obligations.

### Sherrie Dotson Incident

On November 2, 2016, less than five months into Hueramo's employment with the Village, Sherrie Dotson spoke with Sergeant Byron Redmond to make a complaint regarding an incident involving Hueramo. Hueramo was patrolling the area near Ms. Dotson's home when he observed a dog tied up at Ms. Dotson's home getting soaked in the rain. According to Ms. Dotson, Hueramo told her that she "will be arrested" for animal cruelty to the dog.[1] Ms. Dotson explained she had fallen asleep and had no idea that it had started to rain. Ms. Dotson did not like Hueramo's tone of voice during the interaction.

As a result of his interaction with Ms. Dotson, Sergeant Redmond prepared an internal memo of her complaint and had a conversation with Hueramo. Sergeant Redmond advised Hueramo that things can be taken out of context and stated Hueramo

---

[1] Hueramo disputes the use of "will," and asserts that he said that she "could" be arrested.

should refrain from using the word "arrest" because it could cause people, such as Ms. Dotson, to feel threatened with being arrested. Sergeant Redmond did not believe this incident deserved a form of punishment because this was Hueramo's first incident and Ms. Dotson indicated she did not want anything done with Hueramo.

### John Taylor Incident

On November 17, 2016, John Taylor, a resident of a nearby village, went into Chief Wells's office to complain about an incident of a Robbins police officer (later determined to be Hueramo) being disrespectful. Mr. Taylor was in tears when speaking to Chief Wells. Chief Wells informed Mr. Taylor he would look into it and subsequently asked Deputy Chief Darren Hatchett to meet with Hueramo and find out what happened. Chief Wells also prepared an internal memo regarding the incident.

On November 23, 2016, Mr. Taylor met with Deputy Chief Hatchett to discuss two tickets he received from Hueramo, claiming Hueramo was "very rude and aggressive." Mr. Taylor did not wish to file a formal complaint; he wanted Hueramo to be more considerate.

### Arnice Sykes Incident

On November 26, 2016, Hueramo conducted a traffic stop on Arnice Sykes. When Ms. Sykes explained to Hueramo that her driver's license was suspended, he placed her under arrest. Ms. Sykes asked Hueramo if a family member could pick up the vehicle instead of being towed, but Hueramo denied this request. According to Ms. Sykes, when she tried asking Hueramo another question, he told her to "shut the

6

f**k up."  Hueramo denies saying this and asserts Ms. Sykes was argumentative and using profanity towards him.

Commander Jovan Upshaw arrived at the scene of the incident as backup. Hueramo informed Commander Upshaw that Ms. Sykes would be taken into custody for driving on a suspended license. Commander Upshaw observed Hueramo place Ms. Sykes in his vehicle.

Upon arriving at the station for booking, the dispatcher, Margie Tate, buzzed the door to the booking room open.  Ms. Sykes was resisting and refusing to go through the door, so Hueramo grabbed her arm and placed her against the wall.  Ms. Sykes reported that she was grabbed by the neck of her hooded sweatshirt and pushed into the wall. Hueramo radioed for assistance, and Commander Upshaw responded.  Commander Upshaw observed Ms. Sykes resisting Hueramo and trying to push off of him.  Both Commander Upshaw and Ms. Tate testified they did not see anything improper on Hueramo's part.

Commander Upshaw took over and placed Ms. Sykes in an interview room. Ms. Sykes was cooperative with Commander Upshaw and stated that she wanted to file a complaint against Hueramo.  Chief Wells also spoke with Ms. Sykes in his office, and she was in tears during the conversation.

Following Ms. Sykes's arrest, Commander Upshaw was asked to draft a memo summarizing the incident. When Chief Wells asked Commander Upshaw about the incident, his recitation of the events mirrored the contents of the memo.  Chief Wells

indicated an internal investigation was being conducted by Commander Bobby Young. Commander Upshaw spoke to Commander Young and reported that he did not observe any improper conduct on Hueramo's part. In conducting his internal investigation, Commander Young also spoke with Ms. Sykes, Ms. Dotson, Ms. Tate, Sergeant Redmond, and Hueramo.

### *Hueramo's Termination*

On November 28, 2016, prior to the completion of Commander Young's internal investigation, Chief Wells called Hueramo into his office and handed him his termination letter. The letter stated Hueramo had not met the expectations of the department. The letter did not state that Hueramo violated any specific department policies, it simply cited the "Terms of hire understanding" that Hueramo was considered a probationary officer and could be terminated without cause. Dkt. # 86-1. Hueramo contends Chief Wells's failure to notify him of the basis for his termination violated the department's disciplinary policy.

The Robbins Police Department has written policies which emphasize the importance of Village employees treating the public in a civil, courteous, and professional manner. According to Chief Wells, if a certain officer gets multiple complaints in a short frame of time, it is a red flag to him. Chief Wells made it a priority for officers in his department to be professional with citizens. Chief Wells stated he made the decision to terminate Hueramo prior to the conclusion of Commander Young's

internal investigation because of the multiple complaints against him within a short period of time.

Sergeant Redmond testified that when he asked Chief Wells why Hueramo was fired, Chief Wells stated, "sometimes there just has to be casualties of war." Dkt. #74-5, at 54–55. Chief Wells denies having a conversation with Sergeant Redmond about the reasons for Hueramo's termination.

Commander Upshaw tried to convince Chief Wells that he should reconsider terminating Hueramo's employment as well. Chief Wells responded that Hueramo was the subject of other internal investigations, although there is no evidence of any investigation other than the one being conducted by Commander Young.

Prior to Hueramo's termination, Sergeant Redmond had never heard of a Robbins police officer being fired for being rude to citizens. Sergeant Redmond had a number of conversations with Deputy Chief Hatchett about Hueramo and how he was dependable, reliable, and a good worker. Commander Upshaw also found that Officer Hueramo was reliable and dependable, and believed Hueramo was professional in his interactions with citizens. Hueramo was considered a team player and would often stay at work to help his coworkers. In fact, Sergeant Redmond believed that Hueramo was one of the best officers in the department.

Throughout his employment, Hueramo communicated regularly with Chief Wells via text messaging. Neither Chief Wells nor Hueramo's direct supervisors ever told Hueramo that he was not meeting his expectations or that he needed to improve his

performance in any way. Hueramo was surprised that he was terminated and claims he was not made aware that there were complaints against him. However, it is undisputed that Deputy Chief Hatchett gave Hueramo a verbal reprimand after the Taylor incident, and Sergeant Redmond spoke to him after the Dobson incident.

### *Misconduct Involving Other Robbins Probationary Officers*

Paul Glasper, who is African American, was a probationary officer for the Robbins Police Department from November 4, 2016, to October 23, 2017. Glasper received a citizen complaint from a homeowner regarding an incident occurring on October 3, 2017, when Glasper allegedly violated the homeowner's rights when making an unlawful entry into her residence. The homeowner also purportedly alleged Glasper engaged in other serious misconduct such as responding to her residence in response to an alleged domestic incident only to return later to ask her out on a date; sexually assaulting her; retaliating against her boyfriend by targeting him on traffic stops; and providing her with marijuana confiscated in his capacity as a Robbins police officer.

As a result of the October 3, 2017 incident, Chief Wells reassigned Officer Glasper to the service bureau to assist the dispatch center. Commander Larry Hall then conducted an internal affairs investigation regarding the homeowner's allegations. Despite sustaining the allegations relating to the October 3, 2017 unlawful entry incident, Commander Hall did not recommend termination of Glasper's employment because he did not have a history of misconduct.

10

Chief Wells admitted he did not immediately terminate Glasper because the allegations were not substantiated at the time, and he wanted to wait until they were. Ultimately, based on Commander Hall's recommendation, Glasper was given a three-day suspension for the October 3, 2017 incident. However, prior to serving his suspension, Glasper was terminated for failing to complete academy training before the time to do so expired.

It appeared to Sergeant Redmond that the investigators were more concerned about Glasper's unlawful entry to the residence than the alleged criminal sexual assault. Hueramo contends Glasper was not disciplined as a result of these serious allegations. Defendants dispute this, pointing to the three-day suspension.

Justin Jones, an African American, was a probationary officer for the Robbins Police Department from December 9, 2016, to September 11, 2017. In September 2017, Jones was arrested by the Village of Matteson Police Department. As a result, Jones was immediately placed on unpaid administrative leave while the Matteson Police Department investigated. Chief Wells prepared an internal investigation memo on September 11, 2017, regarding the information he received from Matteson. Jones was promptly terminated after he was criminally charged. Jones's termination letter identified specific Robbins Police Department General Orders that were violated "based on the recent investigation conducted by the Matteson Police Department." Dkt. # 74-14, at 41.

### *Robbins Police Department General Orders*

The Robbins Police Department's General Orders contain policies relating to internal affairs investigations, citizen complaints, and discipline. These policies and general orders apply to both non-probationary officers and probationary officers.

General Order 104 governs internal affairs investigations into misconduct, including citizen complaints. General Order 104 requires that all citizen complaints be investigated by the supervisor in charge. The investigation must be thorough and accurate and include formal statements from all parties concerned. The results of the investigation must be contained in a written report. The written report must contain (1) a summary of the complaint or alleged act of misconduct; (2) relevant portions of statements of all parties to the incident; (3) a description of the incident and physical evidence; and (4) observations and conclusions of the investigating officer. All reports must contain a finding of "unfounded," "exonerated," "not sustained," or "sustained," and the investigator's recommendation for discipline.

General Order 105, the disciplinary policy, states that final departmental disciplinary authority and responsibility rests with the Chief of Police. For all disciplinary action (except oral reprimands) that is taken or recommended, a written report must be submitted which must include, *inter alia*, (1) the general order that was violated or the type of infraction, (2) a complete statement of the facts surrounding the misconduct, and (3) the punishment recommended or imposed. The report must be distributed to the Chief of Police and the individual who is subject to the imposed or

recommended discipline.  The officer being disciplined must be informed of the charges at the time the disciplinary action is taken.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018).  The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).  The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Defendants move for summary judgment on all claims, arguing Hueramo cannot establish he was discriminated against because of his race in violation of Title VII or Section 1983.  Discrimination cases brought under Section 1983 are governed by the

same legal standards as those brought under Title VII, so the Court evaluates the two claims together. *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021).

At summary judgment, Hueramo must demonstrate that the evidence, considered as a whole, would permit a reasonable factfinder to conclude that his race caused his termination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The familiar *McDonnell Douglas* burden-shifting framework is useful in analyzing discrimination claims, although the framework is slightly modified in cases of reverse discrimination (i.e., a race discrimination claim brought by a white plaintiff). *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("[B]oth before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence . . . in discrimination cases.")); *Bless*, 9 F.4th at 574.

To establish a *prima facie* case under the *McDonnell Douglas* framework in a case such as this one, Hueramo must show that: (1) "background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand"; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class. *Bless*, 9 F.4th at 574 (quoting *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016)).

If Hueramo establishes his *prima facie* case, the burden shifts to Defendants to offer "legitimate, non-discriminatory reasons for the adverse employment decision."

*Id.* (cleaned up).  If offered, the burden shifts back to Hueramo to demonstrate those reasons are pretext for race discrimination.  *Id.*

At the end of the day, though, "all evidence belongs in a single pile and must be evaluated as a whole." *Lewis v. Wilkie*, 909 F.3d 858, 871 (7th Cir. 2018) (quoting *Ortiz*, 834 F.3d at 766).  Accordingly, the Court first organizes and analyzes the relevant evidence under the *McDonnell Douglas* framework, then assesses that evidence holistically.

Because Defendants raise Hueramo's performance as the reason for his termination, the Court can skip the *prima facie* analysis and proceed directly to pretext. *Vichio v. United States Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023).  To show Defendants' reasons are pretextual, Hueramo needs to prove (or at least raise a question of fact) that Defendants' rationale for firing him was dishonest and that the true reason was discrimination.  *See Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007).  Hueramo "must do more than merely point to race and proclaim: 'Aha! Discrimination.'" *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 829 (7th Cir. 2006).

The Seventh Circuit has stated "in more than one hundred reported opinions" that a district court is "not a super-personnel department that [can] substitute [its] criteria for an employer's for hiring, promoting, or disciplining employees." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 933 (7th Cir. 2020) (citations omitted).  "It is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee." *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir.

2005) (cleaned up). In other words, the issue is not the fairness or accuracy of Defendants' reasoning, but the honesty of Defendants' belief in the reasons given. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (citations omitted); *see also Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021) ("The question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reasons is *honest.*") (cleaned up).

Defendants argue Hueramo was not meeting legitimate employment expectations at the time he was terminated. While Hueramo focuses on the fact that he was praised for his work early on, what matters is Hueramo's job performance through the eyes of his employer *at the time of his termination*. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 310 (7th Cir. 2012). The undisputed facts show that Hueramo's supervisors were made aware of three separate allegations of unprofessional conduct in his interactions with members of the public, all of which occurred in a span of less than one month and less than six months into his probationary period.

Hueramo argues each claim of misconduct was ultimately found to be unsubstantiated, and none of his supervisors informed him prior to his termination that he was performing his job unsatisfactorily or that he needed to improve his job performance.

Hueramo attempts to demonstrate that the Defendants' reason for his termination was a lie by pointing to similarly situated, African American probationary officers who were better treated. "Similarly situated employees must be directly comparable to the

plaintiff in all material respects." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 212) (citations and quotations omitted). "The goal of the comparison analysis is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Formella*, 817 F.3d at 512 (cleaned up). There is no "magic formula"; rather, courts must conduct a "common sense examination," and "ask whether there are enough common features between the individuals to allow a meaningful comparison." *Johnson*, 892 F.3d at 898 (citing *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012)).

Here, the two proposed comparators, probationary officers Jones and Glasper, were both terminated after incidents of misconduct. Thus, Defendants argue, they were not treated better than Hueramo. Defendants also argue Jones is not a proper comparator because his misconduct did not involve a citizen complaint. However, even if neither officer is a proper comparator, the undisputed facts about Jones and Glasper are part of the pile of evidence presented by Hueramo that must be evaluated as a whole. *See Ortiz*, 834 F.3d at 766.

Jones and Glasper arguably committed more serious offenses than Hueramo— Glasper unlawfully entered a citizen's home, and Jones was arrested and subsequently charged with a criminal offense. However, unlike Hueramo, both officers were disciplined only after the misconduct was investigated and the allegations were substantiated.

17

Chief Wells admitted that he did not immediately discipline or terminate Glasper because he wanted to wait until the allegations were substantiated. Glasper was instead reassigned pending the outcome of an internal investigation. Even when the allegations against him were substantiated, Glasper was not terminated—he was given a three-day suspension.[2] Glasper's termination was the result of failing to complete academy training within the allotted time.[3]

Similarly, Jones was not immediately terminated when he was arrested; he was placed on unpaid leave. Jones was only terminated once Chief Wells had the information from the Matteson Police Department and Jones was criminally charged. And, unlike in Hueramo's case, Jones's termination letter noted Jones had not successfully completed his probationary period and identified specific Robbins Police Department General Orders that were violated "based on the recent investigation conducted by the Matteson Police Department." Dkt. # 74-14, at 41. In contrast, Hueramo's termination letter merely stated, in relevant part, "After review of your probationary period, you have not met the expectations of the Robbins Police Department. Your position as a Robbins Police Officer is terminated immediately." Dkt. # 86-1.

---

[2] Defendants assert Glasper was suspended, not fired, because it was his first instance of misconduct.

[3] Defendants describe this as "a second act of misconduct."

Defendants argue Hueramo's claims that department disciplinary policies were not followed and the fact that Hueramo's internal investigation was not concluded prior to his termination are not relevant because he is not raising a due process claim. Even so, it is evidence of inconsistent disciplinary practices. *See*, *e.g.*, *Principe v. Vill. of Melrose Park*, 2022 WL 488937, at *10 (N.D. Ill. 2022) (holding that "inconsistent disciplinary practices," among other pieces of evidence, supported the plaintiff's discrimination claim); *Baker v. Macon Resources, Inc.*, 750 F.3d 674, 677 (7th Cir. 2014) ("[S]elective enforcement or investigation of a disciplinary policy can also show pretext."). However, minor deviations from written policies are "insufficient to avoid summary judgment" without supporting circumstantial evidence. *Hanners v. Trent*, 674 F.3d 683, 695 (7th Cir. 2012); *see also West v. Dejoy*, 2024 WL 3508452, at *6 (E.D. Wis. 2024) ("And while an employer's failure to follow its own internal employment procedures *can* constitute evidence of pretext, not every policy violation suggests pretext. There must be something about the policy violation to suggest the deviation was motivated by an intent to discrimination.") (internal quotation marks and citations omitted). Hueramo has not put forth such circumstantial evidence.

Taking all the evidence together, the Court cannot say that a reasonable factfinder could conclude that Hueramo's race caused his discharge. Chief Wells made it a priority for his officers to be professional when interacting with members of the public. Three reported incidents of unprofessional conduct by a probationary officer was a red flag to Chief Wells**.** The fact that Chief Wells knew Hueramo had citizen complaints lodged

against him while at three other police departments, and the fact that all three of the Robbins complaints occurred in less than a month and less than six months into Hueramo's probationary period, made those complaints a much bigger red flag and even more concerning to Chief Wells. Two of the complainants were in tears in Chief Wells's office when discussing their interactions with Hueramo. Even if Commander Young's internal investigation ultimately found the complaints lacked merit, what matters is what Chief Wells honestly believed at the time he made the decision to terminate Hueramo. At that time, Chief Wells had no reason to doubt the veracity of the complaints, especially considering his knowledge of Hueramo's history of complaints prior to his employment with Robbins. And the fact that Chief Wells hired Hueramo in the first place is a strong indication that Hueramo's race was not a factor in Chief Wells's termination decision.

While the decision to terminate Hueramo may seem harsh, again, "[i]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee." *Ineichen*, 410 F.3d at 961. Defendants are entitled to summary judgment on Hueramo's race discrimination claims.

## **CONCLUSION**

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment [72]. Judgment is entered in favor of Defendants on all claims. Civil case terminated.

It is so ordered.

_____
Charles P. Kocoras
United States District Judge

Date: September 12, 2024